**Eugene duPONT III, Plaintiff,**

v.

**SOUTHERN NATIONAL BANK OF HOUSTON, TEXAS, Trustee, et al., Defendants.**

**Civ. A. No. H–81–1546.**

United States District Court, S.D. Texas, Houston Division.

Sept. 27, 1983.

852

J. Clifford Gunter III, Bracewell & Patterson, Houston, Tex., for plaintiff.

A. Hoyt Rowell, III, Gibbs, Gaillard & Rowell, Charleston, S.C., Margaret Irene Jones, John duPont Waters, Virginia Irene Waters, Florence, S.C., Duncan E. Osborne, John T. Anderson, Graves, Dougherty, Hearon, Moody & Garwood, Austin, Tex., Frank B. Davis, Andrews & Kurth, Houston, Tex., Robert A. Gwinn, Jerry D. Johnson, Johnson, Bromberg & Leeds, Dallas, Tex., Ronald L. Palmer, Baker & Botts, Houston, Tex., George J. Goldsborough, Jr., Goldsborough, Franch & Collett, P.A., Easton, Md., H. Lee Godfrey, Wood, Campbell, Moody & Gibbs, Houston, Tex., for defendants.

Leslie Dudley Myrin, pro se.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

STERLING, District Judge.

This is a civil action brought by Plaintiff Eugene duPont III against the trustees,

income and contingent beneficiaries and remaindermen of an *inter vivos* trust created by Plaintiff on December 14, 1972, seeking, *inter alia*, to have the Court rescind, revoke or modify the trust. The case was tried to the Court. At the close of Plaintiff's evidence Defendants Southern National Bank of Houston, John H. Gardner, Edward J. Brady and Eugene duPont IV moved for dismissal of the action pursuant to Rule 41(b), Fed.R.Civ.P. After considering the weight and credibility of the evidence and the argument of the parties, the Court granted the motion for Defendants on the issue of validity of the trust, but found that trustee fees were improperly calculated. The Court enters the following findings of fact and conclusions of law pursuant to Rule 52(a), Fed.R.Civ.P.

*Findings Of Fact*

A. *The Parties and Issues.*

1. Plaintiff, Eugene duPont III ("duPont III"), is a resident of the State of Florida. Plaintiff is settlor of an *inter vivos* trust under an agreement dated December 14, 1972 ("Trust").

2. Defendant, Southern National Bank of Houston, Texas ("SNB"), is a banking corporation with its offices in Houston, Harris County, Texas. SNB is the corporate trustee under the Trust and is a party to this action in its capacity as trustee.

3. Defendant, Edward J. Brady ("Brady"), is a resident of the State of New York. Brady is a trustee under the Trust and is a party to this action as trustee.

4. Defendant, John H. Garner ("Garner"), is a resident of the State of Texas. Garner was an officer of SNB and subsequent to his resignation from SNB was appointed as an individual trustee under the Trust. He is a party to this action as trustee.

5. Defendant, Eugene duPont IV ("duPont IV") resides in the State of Maryland and is the minor son of Plaintiff and a former wife, Joanne A. duPont. He is a life income beneficiary under the Trust.

6. Defendant, Margaret Irene Jones ("Jones"), is a daughter of Plaintiff and a contingent beneficiary and remainderman under the Trust. Jones is a resident of the State of South Carolina.

7. Defendant, Daphne Burma Vaughan ("Vaughan"), is a daughter of Plaintiff and a contingent beneficiary and remainderman under the Trust. Vaughan is a resident of the State of Texas.

8. Defendant, Leslie Dudley Myrin ("Myrin"), is a daughter of Plaintiff and a contingent beneficiary and remainderman under the Trust. Myrin is a resident of the State of Wyoming.

9. Defendant, Genette Lee duPont ("Genette duPont"), is a contingent beneficiary and remainderman under the Trust. Genette duPont is a resident of the State of South Carolina.

10. Defendants, John duPont Waters ("John Waters"), Virginia Irene Waters ("Virginia Waters"), Benjamin Franklin Vaughan IV ("Benjamin Vaughan IV"), Cuthbert Latta Myrin, Jr. ("Cuthbert Myrin"), and Mimi duPont Myrin ("Mimi Myrin"), are the grandchildren of Plaintiff and are contingent beneficiaries and remainderman under the Trust. John Waters and Virginia Waters reside in Florence, South Carolina. Benjamin Vaughan IV resides in Austin, Texas. Cuthbert Myrin and Mimi Myrin are minor grandchildren of Plaintiff who reside in Jackson, Wyoming.

11. In his original complaint, duPont III brought this action seeking to have the Court rescind or revoke the Trust on the grounds (1) that he created the Trust based on a mistake of fact and law—specifically, that the transaction would not be subject to federal transfer taxes; (2) that the purposes for which he created the Trust have become frustrated and impossible to accomplish; (3) that through no fault of his own, the Trust was never fully consummated; and (4) that the Trust was improvidently created by him.[1] Alternatively, duPont III

---

1. The gravamen of Plaintiff's argument rests on the fact finding that his primary purpose for creating the trust was to minimize transfer taxes. In light of the Court's finding that this was

seeks to have the Trust modified and reformed to include a marital deduction clause, a by-pass trust or a tax allocation clause.

12. In a motion to amend the complaint, which was granted by the Court on November 9, 1982, as a motion to supplement pleadings, Plaintiff sought to have the Court remove Brady and Gardner as trustees on the grounds that there is hostility between these trustees and Plaintiff and that they no longer render beneficially active services to the Trust. Additionally, Plaintiff supplemented his complaint to allege that the trustees incurred excessive, duplicative and unnecessary legal fees to defend this action. Additionally, Plaintiff contends that the legal fees, which were charged to the income account of the Trust, should have been allocated between the corpus and income accounts.

13. In his answer, duPont IV counterclaimed alleging that the Trust is valid and enforceable and seeking to have the Court order duPont III to transfer to the Trust all properties in his possession and under his control which are the subject of the Trust; award punitive damages because Plaintiff's allegations are wanton, malicious and unfounded; and award reasonable attorney fees for this action.

### B. *Validity Of the Trust.*

14. On December 14, 1972, duPont III created an *inter vivos* trust naming Brady and SNB as co-trustees. After the Trust was established Garner resigned his position at SNB and, at duPont III's request, was appointed a co-trustee.

The dispositive provisions of the Trust provide for successive life estates in duPont III, as settlor, and his son duPont IV, followed by a contingent remainder in certain descendants of the settlor. During settlor's lifetime, the trustees are authorized to distribute at their sole discretion all or any part of the income of the Trust to the settlor. Since the Trust was created, the trustees have made discretionary payments of the entire income account to duPont III.

15. The gravamen of Plaintiff's argument is premised on the factual contention that his primary motive for creating this Trust was to minimize the ultimate transfer tax liability incurred by his estate upon his death.[2] The Court, however, disagrees with Plaintiff's contention, concluding that on the basis of the evidence, duPont III's primary, if not exclusive, purposes in creating the Trust were (1) to prevent Joanne A. duPont, his former spouse, from obtaining duPont III's property in the event of divorce and (2) to provide for duPont IV on an economic level equal to that which had already been provided to duPont III's children by previous marriages.

This finding is based on weighing the credibility of the evidence and drawing relevant inferences from the following:

(a) The testimony of Brady, duPont III's former lawyer and confidant which the Court finds clear and convincing. Brady testified that he began discussing formation of the Trust with duPont III in February, 1972, and that the purpose for the Trust was not transfer tax considerations but was "to keep the property away from Joanne duPont." This position was confirmed in a third party memorandum dated October 26, 1972, prepared by Edward W. Turley, Jr., who at the time was a partner in a Houston law firm, indicating that it was his understanding "that Mr. duPont wants to place this property in trust, so that [Joanne A. duPont] will have no rights

---

not his motive, Plaintiff's arguments (1) that through no fault of his own, the Trust was never fully consummated; (2) that the purposes for which he created the Trust have become frustrated and impossible to accomplish; and (3) that the Trust was improvidently created are by implication unsupported by the record when drawing all inferences in favor of Plaintiff from the evidence introduced at trial.

2. Plaintiff does not dispute the motive of creating the Trust for the benefit of duPont IV, but he contends that this motive for creating the trust is inextricably intertwined with minimizing transfer taxes on his estate.

with respect to the property placed in trust if she subsequently institutes an action for separation or divorce." DuPont III's Exhibit 14. Although duPont III denies this statement as a motive, the Court relied on its credibility based on duPont III's testimony that it was not his position that Brady fraudulently induced him to execute the Trust and that if the Trust was created for tax purposes it seems more likely so than not so that duPont III would emphasize to third parties the exclusive purpose of the Trust to be tax avoidance.

(b) Secondly, duPont III transferred a substantial number of personal assets with a nominal asset value to the corpus of the Trust. The Court infers that the transfer of these assets, such as a soup tureen and plates, duPont III's Exhibit 6, indicates that the Trust was established for purposes other than minimization of transfer tax liability on the settlor's estate.

(c) Finally, duPont III was apprised of the tax consequences of the transfer in late 1977. Yet in light of his sophistication in financial matters and prior experiences with his father's estate, he continued to utilize and rely upon the validity of the Trust. During his divorce proceedings with Joanne duPont, Plaintiff relied upon the validity of the Trust to assert that his estate was nominal, Finding of Fact No. 19, and to effect the divorce settlement with Joanne.

16. At the time the Trust was created there was a dispute as to transfer tax liability. In his memorandum dated October 26, 1972, Turley concluded that "... when a pure discretionary trust is created, it is not clear that either a gift or an estate tax is required to be paid." DuPont III's Exhibit 14, p. 2. The memorandum and Turley letter of November 16, 1972, indicates that the parties intended to treat this item as a gift for transfer tax purposes. DuPont III's Exhibit 15. Moreover, Brady testified at trial that he told duPont III that a gift tax would probably be due on the transfer. Finally, Plaintiff introduced the expert testimony of Theodore Kurtz, a New York tax attorney, who testified that

it was his opinion that a gift tax was due on the transaction.

Although there is some dispute as to the liability, if any, no taxing authority, federal or state, has assessed or begun an audit of the transaction for purposes of assessing a tax.

17. During the time the Trust was drafted, revised and executed (SNB and Garner's Exhibit 5), duPont III reviewed the drafts, read the final trust agreement before signing it and was advised by legal counsel at each step in the formulation and execution of this Trust.

18. In fact, duPont III was specifically advised of the potential tax consequences of the Trust. While duPont III testified that he was advised that the execution of the Trust was not subject to a federal transfer tax, Brady testified that duPont III was informed that the transfer was a taxable event subject to federal gift and possible estate taxes.

In any event, duPont III was aware of the potential tax consequences of the Trust in November, 1977, when he received information from Theodore A. Kurtz, concerning the tax implication of the transfers to the Trust. Additional evidence indicating duPont III's knowledge in 1977 was provided by the testimony of Max Schuette ("Schuette"), former chairman of the Board of SNB.

Schuette testified that he accompanied duPont III to Brady's office either on November 1 or 2, 1977, to assist duPont III terminate Brady's services, see duPont III's Exhibits 49 and 50; SNB and Garner's Exhibit 19. Schuette testified that during their meetings duPont III indicated to Schuette that he was aware of and concerned about the tax consequences of the Trust.

19. Although duPont III was aware of the potential tax problem in 1977, he continued to rely on the Trust and recognize its validity until shortly before filing this lawsuit. In his 1978 divorce proceeding from Joanne duPont, Plaintiff relied upon the validity of the Trust to protect the

property from his liability to his spouse upon divorce, SNB Exhibits 13, 14 and 15, including realty located in New York, South Carolina and Maryland. DuPont III testified that in negotiating the final divorce settlement with Joanne A. duPont's lawyers, he utilized the Trust to complete the settlement—specifically, he petitioned the Trust to provide a house for his son and ex-wife and to pay part of his alimony. DuPont IV Exhibit 1 and SNB Exhibit 13.

20. DuPont III, upon creation of the Trust and at various times, subsequently executed and delivered to the trustees various deeds, assignments and other instruments which evince his intent to transfer various assets to the Trust. Thereafter, duPont III had knowledge of purchases, sales, management and the exercise of title rights by the trustees but did not object or complain.

21. This suit was filed in 1981, over four years after duPont III learned or should have learned of any mistake that induced him to create the Trust. His sophistication and advice from experts indicate that he was aware of the irrevocable conditions of the Trust and the difficulty in rescinding or modifying all or part of the provisions of the Trust.

## C. Relationship Between Brady, Garner and duPont III.

22. In his supplemental complaint, duPont III seeks to have the Court remove Brady and Garner as trustees of the Trust on the grounds that there (a) exists hostility between the parties and (2) these trustees do not perform beneficial functions.

23. There is no evidence in the record to support duPont III's contention either that there exist hostile feelings between duPont III and Brady or Garner or that Garner or Brady perform useless or redundant functions. Indeed, duPont III testified that he and Brady are still friends and that with regard to the potential tax consequences, he harbors no hard feelings because "anyone can make a mistake." Additionally, the record does not contain evidence of the parties' failure to provide beneficial services to the Trust.

## D. Brady's Legal Expenses.

24. DuPont III seeks to have the Court order Brady to reimburse the Trust for legal fees paid by the Trust on his behalf. DuPont III argues that the trustees interests in defense of the Trust are aligned and the need for separate counsel is unnecessary and a waste of Trust assets. Accordingly, Brady should reimburse the Trust for legal fees paid on his behalf which were duplicative of legal work performed for SNB and Garner or related to legal preparation of any defense not related to the validity of the Trust.

25. Although presentation of the case did not involve conflicting claims by the trustees, the potential for conflicts between the trustees leads the Court to the conclusion that the decision to retain separate counsel was prudent and reasonable. Moreover, there is no evidence in the record to support a claim that the expenses were duplicative or unrelated to the maintenance of the Trust.

## E. Excessive Trustee Fees.

26. The trustee compensation provisions of the Trust agreement for the Trust provide, in pertinent part:

"The compensation of each Trustee shall be seventy-five percent of the following amounts during Settlor's lifetime, and one hundred percent thereafter.

1. One per annum on the first $100,000 of the fair market value on December 31 of the personal property included in the Trust Estate;

2. One-half of one percent per annum on the next $1,900,000 of the fair market value on December 31 of the personal property included in the Trust Estate;

3. Three-eighths of one percent per annum on the next $3,000,000 of the fair market value on December 31 of personal property included in the Trust Estate;

4. One-fourth of one percent per annum on the balance of the fair market value of the personal property included in the Trust Estate;

5. One percent of all distributions of principal cash distributed from the Trust Estate to the beneficiaries of any trust created in this Agreement;

6. Two percent on the first $2,500, and one percent on the balance, of any distributions of income cash from the Trust Estate to the beneficiaries of any trust created in this Agreement. If John H. Garner is one of the trustees and there are three trustees, the total compensation shall be that to which two trustees would be entitled, with this total compensation being divided equally among the three trustees."

27. The evidence indicates that 169.996 acres of land known as Shaw Bay Farms in Easton, Talbot County, Maryland and 7,218 acres of land known as Nemours Plantation and located in Yemassee, Bedford County, South Carolina were included in the calculation. Additionally, the 710 shares of stock in a cooperative apartment at 10 E. 70th St. in New York City were included in the base used to compute trustee fees. SNB and Garner Exhibit 76.

28. According to the agreement, trustee fees are computed on a base of personal property. Since the property known as the Shaw Bay Farms and Nemours Plantation are included in the trustee fee base, the Court finds that trustee fees were miscalculated since these assets were included in the fee base. DuPont III contends that the 710 shares of stock in the New York City cooperative apartment should not be included in the trustee fee base because the asset is realty. The trustees contend that the asset in the Trust is the shares of stock which they argue is personalty.

29. The Court ordered the trustees to submit an accounting of trustee fees based on the asset values [3] indicated on the trust ledgers. The trustees submitted the following accounting to the Court.

Eugene duPont III Irrevocable Trust
Trustee Fee Recalculation
(Based On Values As Per Statements
Less Real Estate)

|  | Amount Paid | Recalculated Fee (With 10 E. 70th St.) | Recalculated Fee (Without 10 E. 70th St.) |
|---|---|---|---|
| 1973 | $ 27,735.36 | $ 25,225.47 | $ 25,225.47 |
| 1974 | 23,503.98 | 20,309.32 | 19,510.58 |
| 1975 | 18,663.84 | 25,490.35 | 24,691.60 |
| 1976 | 26,354.94 | 28,981.76 | 28,126.76 |
| 1977 | 33,600.00 | 26,962.76 | 26,164.00 |
| 1978 | 45,094.20 | 27,565.36 | 26,766.62 |
| 1979 | 62,137.30 | 58,117.10 | 56,804.59 |
| 1980 | 78,242.14 | 63,599.74 | 62,287.24 |
| 1981 | 77,844.00 | 60,844.98 | 59,532.48 |
|  | $393,357.76 | $337,096.84 | $329,109.34 |
|  |  | $(56,260.92) | $(64,248.42) |

F. *DuPont IV's Counterclaim.*

30. DuPont IV seeks to have the Court order duPont III to convey to the Trust all assets over which he has possession and control which are recorded as trust assets. Although duPont III testified at trial that his original intention was to convey all his personal assets to the Trust, his property

3. In this case, duPont III contends that the property in New York and South Carolina—respectively, Harridge House Associates and Nemours Plantation—were in the Trust.

known as Nemours Plantation, his limited partnership interest in Harridge House Associates and his stock in General Motors, duPont, and Raychem were never effectively transferred to the Trust.

### (a) Nemours Plantation

31. In 1973 duPont III executed three deeds covering property in South Carolina. DuPont III Exhibits 8, 9 and 10. These deeds were held by his attorney, Brady, for several years, but formal delivery to the Trust was never made. DuPont's wife did not renounce dower rights, duPont III Exhibit 28 and 48, and duPont III continued to pay local property taxes until 1979, duPont III Exhibit 46. Early in 1979, the trustees requested duPont III to execute a consolidated deed covering all his property in Beaufort County, South Carolina. DuPont III refused to sign the consolidated deed and renounced the three deeds signed in 1973. The trustees, without duPont III's knowledge and notwithstanding his renunciation, duPont III Exhibit 47, 48, recorded the three deeds on August 31, 1979.

### (b) Harridge House Associates

32. On February 5, 1973, duPont III signed a document entitled "Assignment" which purported to convey stock in a private corporation Dirridge, Inc. Dirridge, Inc. once owned an apartment building commonly referred to as the Harridge House, but several years before the creation of the Trust, Dirridge, Inc. was dissolved and its assets were transferred to a limited partnership known as Harridge House Associates. Brady acted as counsel for duPont III at the time Dirridge, Inc. was dissolved and Harridge House Associates was created. He had actual knowledge of the corporate dissolution and the partnership's ownership of the apartment building at the time duPont III executed the Assignment.

33. The Articles of Limited Partnership covering duPont's interest in Harridge House Associates requires that all partners approve any assignment of interest. DuPont III Exhibit 13, Paragraph 6. Aaron Diamond, general partner of Harridge House Associates, never approved an assignment of duPont III's interest in the limited partnership. DuPont III Exhibit 40.

34. Although duPont III originally intended to place these assets in the Trust, the trustees, including his confidant and attorney Brady, did not try to obtain legal title to these properties until duPont III threatened to break the Trust. DuPont III's Exhibits 28, 40, 41 and 48. Indeed, in the case of Harridge House Associates the trustees' actions did not extend to mere failure to complete these transfers as it did in the case of Nemours Plantation but constituted deliberate manipulation of a Trust asset. Brady testified at trial that distributions from Harridge House Associates had been paid since 1972 to SNB and to Brady. When the distributions were paid to Brady he, on different occasions, remitted the proceeds to the Trust and to duPont III. Additionally, distributions from Harridge House Associates were credited directly to the books of duPont III's custodian account with SNB bypassing the Trust. DuPont III Exhibit 42. Again, it was not until duPont III threatened to break the Trust that the trustees began to clarify title to the Harridge House Associates. (DuPont III Exhibits 40 and 41). Accordingly, the Court concludes that Brady and his co-trustees did not recognize legal title in the Harridge House Associates by the Trust.

### (c) Common Stock Properties

35. The final assets that duPont III contends are not part of the Trust are the stock in General Motors, duPont and Raychem. The testimony by Brady indicates that these stocks were held by a revocable trust created by duPont III on February 10, 1973, with SNB as trustee. DuPont III Exhibit 1. Although the trustees have physical possession of the stock certificates, duPont III has never executed a valid stock power authorizing a transfer agent to formally transfer shares to the Trust. Nevertheless, duPont III's testimony indicating his intention to convey these

assets to the trust and the ultimate transfer of the certificates by SNB nominee indicates that the certificates of stock were validly transferred to the Trust as of February 5, 1973, without protest from duPont III when they appeared on an initial schedule of trust assets, DuPont III Exhibit 54.

36. Any conclusion of law, in whole or in part, which is deemed a finding of fact is hereby adopted as a finding of fact.

## Conclusions of Law

1. The Court has subject matter jurisdiction pursuant to 28 U.S.C. 1332 (1976).

2. The law of the State of Texas controls the issues presented in this case. *See generally*, 5 Scott, *The Law of Trusts*, § 611 (3d ed. 1967).

3. DuPont III brings this action before the Court seeking to rescind, revoke or modify the Trust. At trial duPont III testified on two separate occasions that it was not his position to rescind the Trust but merely to reform or modify the Trust.[4] These judicial admissions by duPont III indicate that he has abandoned his claim to declare the Trust void *ab initio* or invalidate the Trust. Assuming, however, that these admissions are insufficient to sustain a finding of abandonment, duPont III's claims for rescission or modification fail nevertheless.

### A. Rescission or Revocation.

▮ 4. As a general rule the law is clear that where the settlor does not receive consideration for the creation of an inter vivos trust, the trust can be rescinded or reformed for a mistake on the same basis that an outright gift can be rescinded or reformed. *See generally*, RESTATE-MENT (SECOND) OF TRUSTS § 222, comment a (1959); 4 Scott, § 333, pp. 2630–31; Annot. 59 A.L.R.2d 1229 (1958).

▮ 5. In Texas a settlor of a trust cannot through judicial action have a trust revoked against the consent of the beneficiary unless a power of revocation has been reserved. *Monday v. Vance*, 92 Tex. 428, 49 S.W. 516 (1899, error ref'd); *Putnam v. Heissner*, 220 S.W.2d 701 (Tex.Civ.App.—Austin 1949, no writ). *See generally*, Bogert, *The Law of Trusts and Trustees*, § 998, p. 454 (2d ed. 1962). However, where the power of revocation has been omitted from the trust by mistake, the settlor can have the instrument reformed and can then revoke the trust. 4 Scott, § 332, p. 2624–30. Where the creation of the trust was induced by mistake, the settlor may rescind the trust disposition. *Id.* at § 333.4, p. 2634–37. While the general rule is supported by significant commentary, no Texas court has rescinded or revoked a trust on the ground that the settlor was induced to create the trust by a subjective or objective mistake of law at the time of its creation. Thus, duPont III's contentions before the Court raise an issue of first impression in Texas.

6. This Court sitting with diversity jurisdiction is constrained to follow the law of Texas and, based on relevant Texas law and the laws of other states, decide the case as the Supreme Court of Texas would decide this issue if confronted with the question. *See, e.g., Day & Zimmerman, Inc. v. Challoner*, 423 U.S. 3, 4, 96 S.Ct. 167, 168, 46 L.Ed.2d 3 (1975) (per curiam); *Wilen Manufacturing Co. v. Standard Products Company*, 409 F.2d 56, 57 (5th Cir.1969); *Insurance Company of North*

---

4. DuPont III testified at trial as follows:
 "Q. And in fact you have made no provision for [duPont IV] except the provision that you have made by the Trust that you now seek to revoke.
 "A. No, I do not wish to revoke it. I want to restructure it.
 And again, duPont III expressed a similar idea.
 "Q. The point is that you are not trying to break this trust because of any financial straights you are in at this time, are you?

 "A. No. This is just to restructure it so that Uncle Sam doesn't get 70 percent of the Trust plus penalties."
 In subsequent testimony duPont III did not try to retract these statements or clarify his position. Accordingly, the Court is of the opinion that their plain meaning should stand for duPont III's intent.

America v. English, 395 F.2d 854, 860 (5th Cir.1968); First National Bank of St. Paul v. Trust Company of Cobb County, 510 F.Supp. 651, 656 (N.D.Ga.1981). Accordingly, this Court will review the law of rescission or revocation of trusts on the ground of mistake in the inducement.

7. The evidence required to establish the mistake upon which an instrument will be rescinded or reformed has been described as "absolute" evidence, Kiser v. Lucas, 170 Md. 486, 185 A. 441, 446 (Md.1936) (voluntary deed of trust); "evidence of the most satisfactory character," Du Pont v. Du Pont, 19 Del.Ch. 137, 164 A. 238 (Del. 1933) (voluntary trust); and as "clear and convincing evidence." Pernod v. American National Bank & Trust Co. of Chicago, 8 Ill.2d 16, 132 N.E.2d 540, 59 A.L.R.2d 1223 (Ill.1956); "substantial evidence," Walton v. Bank of California, 218 Cal. App.2d 527, 32 Cal.Rptr. 856, 866 (1963).

■ In this case, the Court is presented with the uncorroborated testimony of the settlor of the trust who claims that but for the mistake of law he would not have created the Trust. The authorities are divided on the weight that the Court should accord the testimony of a settlor of a trust. The position is that revocation should not be given for mistaken omission of a power to revoke solely on the basis of the settlor's testimony. RESTATEMENT (SECOND) OF TRUSTS § 332, comment c (1959), followed by Pernod, supra. At least one commentator has rejected this view, taking the position that the trier of fact can weigh the credibility including any self interest of the witness. 4 Palmer, Law of Restitution § 18.7, p. 35 (1978). The Court agrees with this latter position, and accordingly, rejects Defendant duPont IV's position that the settlor's testimony inherently should not be accorded any weight.

■ 8. In a gift situation, the importance of the mistake must be such that it involves "the essence of the object in view and [is] not ... merely incidental." The Court must be satisfied that but for the mistake, the complainant would not have assumed the obligation from which he seeks to be relieved." Walton, supra, 218 Cal.App.2d at 545, 32 Cal.Rptr. at 868 (emphasis in original). See generally, 4 Palmer, § 18.6(b), p. 29.

9. The alleged mistake in this transaction involves a mistake as to the transfer tax consequences of the creation of the Trust. In Stone v. Stone, 319 Mich. 194, 29 N.W.2d 271 (Mich.1947), the Supreme Court of Michigan permitted the settlor of a trust to rescind the trust for a mistake as to tax consequences. In Stone the settlor created a trust for the sole and specific purpose of deflecting income taxes from his partnership to his children and thereby reducing the total income tax liability of his family. Subsequently, the Commissioner of the Internal Revenue Service determined that the entire income of the partnership must be taxed against the father. The father sued to rescind the trust on the ground of a mistake of fact and law because of the failure of the plan upon which the transfers were predicated and because of the unfairness that he should be taxed in full when he only owned one-fourth of the partnership. In the only other case since Stone to discuss rescission because of a mistake in the tax consequences, relief was denied. In Walton, supra, the settlor of an irrevocable inter vivos trust tried to rescind the trust claiming that but for a mistake as to the tax liability she would not have created the trust. The court held, however, that the plaintiff was motivated to create the trust not for tax purposes but to free herself from the demands of her children and that her main objective was to place all her assets in trust so that no one could touch them. The estimated tax liability was something incidental to the main purpose and did not "go to the essence of the object in view." The Walton court distinguished Stone, supra, stating that in Stone the trust was created solely for tax benefits whereas in Walton other purposes of the trust were disclosed. In both Walton and Stone tax liabilities had actually been assessed by the government. See generally, 4 Palmer, § 18.7(b), pp. 37–44.

■ 10. Based on an analysis of relevant precedents, the Court is of the opinion that the Texas Supreme Court when presented squarely with the issue before the Court, would conclude that the following are necessary factors that the Plaintiff must establish for the revocation or rescission of a trust based on unilateral mistake by the settlor as to tax consequences:

(a) that the settlor's trust was created solely for tax considerations;

(b) that the tax considerations had been definitely changed or frustrated by an actual assessment and determination of liability or by a change in the law by statute or judicial construction which would lead an expert to conclude that a transfer tax liability would more likely than not accrue on this transaction; [5]

(c) that the changed tax circumstances amount to a material mistake;

(d) that the Plaintiff is able to establish by clear and convincing evidence that but for the mistake the Plaintiff would not have entered the transaction; and

(e) that at the time Plaintiff knew or had reason to know of the mistake he acted immediately to remedy his situation.

■ 11. As to each of the factors discussed above, the Court finds:

(a) The primary purpose for which duPont III created this Trust was to keep his assets out of the reach of his wife Joanne in the event of a divorce. The Trust was established to provide support for his son, duPont IV, on a nearly equal level as to what had been provided for his other children. The gift tax and estate tax consequences of this Trust were merely incidental considerations to duPont III's primary purposes of placing his assets beyond the reach of his wife in the event of divorce.

(b) There has been no definite assessment or determination that gift taxes or estate taxes will be assessed and due from the establishment of the Trust.

(c) There is sufficient evidence in the record to conclude that the issue of transfer tax liability is in dispute. However, assuming, *arguendo*, that a liability is assessed

---

**5.** DuPont III brought this suit seeking a declaratory judgment that, because he was mistaken as to the tax consequences and advantages of creating the Trust, the Trust should be rescinded, revoked, or modified. Such relief would require this Court to find the primary purpose for the creation of this Trust was to achieve certain tax benefits and that the tax consequences of creating the Trust were misrepresented to duPont III. To make such a determination, Plaintiff seeks to have the Court make a determination, in declaratory judgment form, that substantial and material unanticipated federal estate or federal gift taxes are due or will become due as a result of the trust transaction. The Internal Revenue Service has not assessed, threatened to assess, or even hinted that it has knowledge of the Trust transaction. Under both the literal terms of the Declaratory Judgments Act, 28 U.S.C. § 2201 and the cases interpreting that section, it is quite clear that federal courts cannot make this determination of tax consequences which is essential to the Plaintiff's claim of mistake. The Declaratory Judgment Act provides:

> In a case of actual controversy within its jurisdiction, *except with respect to Federal taxes,* any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be

sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201 (emphasis added). Federal courts have unanimously interpreted the Act to mean what it says and have held that because of the specific prohibition of § 2201 the court has no power to grant declaratory relief based on a determination of whether taxes are due. *E.g., Mitchell v. Riddell,* 402 F.2d 842 (9th Cir.1968) (in which numerous cases are cited).

> Quite apart from the question of whether there is an "actual controversy" and the express exception of the Declaratory Judgment Act removing from the courts the power to declare rights "with respect to federal taxes" the court cannot presume to speak for the commissioner or take over his duty to pass upon the tax status of organizations....

402 F.2d at 846, quoting from *Jolles Foundation, Inc. v. Moysey,* 250 F.2d 166 (2d Cir.1957). One court has noted that "It should be remembered that it is not possible to obtain a declaratory judgment from a federal court as to whether the gift in question is subject to the gift tax." *Commissioner of Internal Revenue v. Procter,* 142 F.2d 824, 827 (4th Cir.1944). Thus, duPont III's request for declaratory judgment in this case fails on the merits because it necessarily seeks a declaration that taxes will be due as a result of the creation of the Trust.

and determined, the Court is unable to conclude that a material mistake has been committed by duPont III in the creation and execution of the Trust.

(d) Assuming, *arguendo*, that duPont III is liable for transfer taxes on this conveyance, the Court is not persuaded by clear and convincing evidence that duPont III would not have created the Trust but for his alleged mistake as to tax consequences.

(e) In 1977, duPont III sought, received and understood the advice of independent counsel as to the potential tax consequences relating to the Trust. Additionally, duPont III as an individual sophisticated in financial transactions, knew or should have known of the potential for tax liability in 1977. DuPont III acted over four years after discovery of the relevant information which would lead a reasonable individual to act.

12. Thus, this Court is of the opinion that the Trust cannot be rescinded or revoked on the ground of mistake in the inducement.

B. *Reformation or Modification.*

13. Alternatively, duPont III seeks to invoke the equitable powers of the Court to modify or reform the trust to include a marital deduction clause, a bypass trust or a tax allocation clause.

14. A single Texas court in two cases has provided reformation of express inter vivos trusts on the ground that a unilateral mistake of the settlor was in existence. *Brinker v. Wobaco Trust Ltd.*, 610 S.W.2d 160 (Tex.Civ.App.—Texarkana 1980, writ ref'd n.r.e.); *Ford v. Ford*, 492 S.W.2d 376 (Tex.Civ.App.—Texarkana 1973, writ ref'd n.r.e.). In both cases cited, however, the Texarkana Court of Civil Appeals reformed trust instruments containing scrivener errors which defeated the true intention of the parties so that the instruments did not express the true agreement of the parties. In the present case duPont III claims that the instrument does not express his true intention—specifically, that the provisions of the trust were established to minimize or avoid transfer taxes on his estate.

15. It is well settled that where the settlor of a trust receives no consideration for the creation of the trust, a unilateral mistake in an express inter vivos trust, as written, fails to express the true intention or agreement of the parties, "equity will grant reformation of the instrument so as to make it correctly express the agreement actually made." *Brinker, supra* at 163.

16. In *Brinker* the Texarkana Court of Appeals considered the issue of reformation of a legal instrument and concluded that "[t]he fact that the written instrument is couched in unambiguous language, or that the parties knew what words were used and were aware of their ordinary meaning, or that they were negligent in failing to discover the mistake before signing the instrument, will not preclude relief by reformation." *Id.* at 164 (collecting cases).

17. Plaintiff cites authority of *Roos v. Roos*, 42 Del.Ch. 40, 203 A.2d 140 (1964) and *Irish v. Irish*, 361 Pa. 410, 65 A.2d 345 (1949) for the proposition that reformation has been permitted where a mistake in the expression of an instrument, due to an attorney's drafting error, resulted in retained powers in the settlor or other which would result in adverse tax consequences. However, this is not the case before the Court. In *Roos*, the court permitted reformation of a trust after death of the settlor based on a specific finding that the purpose of the settlor of the trust was to avoid the tax consequences which would result if the trust did not qualify under the marital deduction and the property was included in the spouse's estate. Similarly, in *Irish*, as a result of a scrivener's error, reformation was permitted to include a provision essential to certain tax laws which had been intended but omitted by inadvertence or mistake. These cases are not dispositive of the issue before the Court because they involve a clear case where the settlor's intent was defeated because of a scrivener's error, which is a factual circumstance not present in this case.

18. In light of these teachings, it is clear that if the Trust did not express the true intentions of duPont III, the Court exercising its equitable power could reform the Trust. In this case, however, the Court finds that duPont III knew what he was doing when he created the Trust, that he wanted to protect his assets upon divorce from Joanne A. duPont and that he changed his mind subsequent to the divorce. See Finding of Fact No. 20.

*C. Relationship Between Brady, Garner and duPont III.*

19. Since there is no evidence to support duPont III's allegations calling for removal of Brady or Garner, the Court concludes that duPont III is not entitled to relief.

20. A trustee can properly incur such expenses as are expressly authorized by the terms of the trust and such expenses as, although not expressly authorized, are necessary or appropriate to carry out the purposes of the trust. *Mason v. Mason,* 366 S.W.2d 552, 554 (Tex.1963). Where a trustee properly incurs expenses, he can pay them out of the trust estate and is entitled to a credit for such payments in his accounts. On the other hand, where an expense is not properly incurred the trustee is not entitled to reimbursement out of the trust estate. 3 Scott, §§ 188 and 244.

21. It is the duty of the trustee to defend claims against the trust estate, which if successful would cause loss to the trust estate. *See, Mason, supra* at 554; *First National Bank of Port Arthur v. Sassine,* 556 S.W.2d 116, 117 (Tex.Civ. App.—1977, no writ). Specifically, it is the duty of the trustee to the beneficiaries to prevent the destruction of the trust. Thus, where the settlor seeks to rescind the trust on the ground that the settlor was induced by mistake to create the trust, it is the duty of the trustee to defend the trust, and resist proceedings to the extent to which it is reasonable to require him to do so. *Mason, supra* at 554. Reasonable expenses, including those incurred in the employment of attorneys, in defending a trust against

an unjustified attack, are payable out of the trust property. TEX.REV.CIV.STAT. ANN. art. 7425b–36 (Vernon's 1960 & Supp. 1982–83). *Van Gorden v. Lunt,* 234 Iowa 832, 13 N.W.2d 341 (1944); *Blackhurst v. Johnson,* 72 F.2d 644 (8th Cir. 1934); *First National Bank of Wichita Falls v. Stricklin,* 347 P.2d 652 (Okl.1959); 3 Scott § 178; Bogert, § 581 (1981).

22. Generally, an expense is properly incurred when it can be shown that the expense (i) is not excessive in amount, (ii) is beneficial to the beneficiaries and the trust estate and not solely for the benefit of the trustee; and (iii) is not caused by the personal fault or error of the trustee. *See generally,* Bogert, § 801 (1981). *See Birmingham Trust National Bank v. Harrison,* 403 So.2d 224 (Ala.1981) (per curiam) (co-trustee is entitled to recover attorney fees for separate counsel when incurred in good faith and to protect the trust's interest). Generally, a fiduciary is under a duty to protect an estate from unnecessary expense. *Crowell v. Styler,* 314 Mass. 122, 49 N.E.2d 599 (1943). Specifically, in the case of attorney fees, a trustee is entitled only to reimbursement from the trust estate for fees which constitute "a fair allowance for the professional work necessary to be done in the proper protection of the trustee's interests." *In Re Delamater's Estate,* 51 N.Y.S.2d 399 (1944), *aff'd,* 292 N.Y. 518, 54 N.E.2d 205 (1944), or "which the trustee, acting reasonably and in good faith, incurs in defense of litigation charging him with breach of trust." *Grey v. First National Bank in Dallas,* 393 F.2d 371, 387 (5th Cir.), *cert. denied,* 393 U.S. 961, 89 S.Ct. 398, 21 L.Ed.2d 374 (1968).

23. DuPont III argues that a trustee may not obtain reimbursement for litigation expenses from the trust estate where those expenses are incurred not for the benefit of the trust estate but for the benefit of the trustee individually. Although a litigation expense incurred to prevent the Defendant's removal as trustee is a proper expense performed on behalf of

the Trust, *see In re Gerber Trust,* 117 Mich.App. 1, 323 N.W.2d 567, 572 (1982), where legal fees are paid to counsel whose efforts are principally directed towards protecting the trustee from an expense which does not benefit the trust—in this case it is alleged that Brady has incurred litigation expenses to defend against an allegation of negligence—those fees must be paid by the trustee, without reimbursement from the trust estate. *In re Corcoran Trusts,* 282 A.2d 653 (1971), *aff'd sub nom., Bankers Trust Company v. Duffy,* 295 A.2d 725 (Del.1972).

Additionally, where litigation results from the fault of the trustee, he is not entitled to charge the expenses of litigation against the trust estate. Thus, where a trustee is found to have committed a breach of trust, the trustee is not entitled to attorney's fees for defending the suit, see, *Matter of Guardianship of Brown,* Ind.App., 436 N.E.2d 877, 891 (1982), or where the trustee engages in obstructive tactics in order to prolong litigation, his legal fees must be borne by him individually. *April v. April,* 245 A.D. 841, 281 N.Y.S. 538 (1935) (per curiam). Finally, where the trustee engages in such conduct which requires his removal, he is not entitled to reimbursement from the trust estate for attorney's fees in connection with his resistance to such action. *Miller v. Burford,* 259 Cal.App.2d 536, 66 Cal.Rptr. 756 (1968).

24. As previously found, duPont III's contentions are not supported by the evidence in this case. Specifically, there is no evidence other than duPont III's conjecture that legal fees paid to counsel to defend Brady against future litigation were incurred in bad faith or for a purpose other than for the benefit of the Trust. Additionally, there is insufficient evidence in the record upon which to sustain a finding that Brady (or SNB or Garner) engaged in obstructive tactics or conduct which would entitle Plaintiff to relief. Accordingly, Plaintiff is not entitled to recovery of attorney fees.

25. Finally, the allocation of litigation expenses between the corpus and income accounts of the Trust is proper under TEX.REV.CIV.STAT.ANN. art. 7425b–36 (Vernon's 1960 & Supp. 1982–83). *See, Templeton v. Continental Illinois National Bank & Trust Company of Chicago,* 429 F.Supp. 1294, 1304 (N.D.Ill.1977) (construing Illinois law).

### E. Trustee Fees.

26. The issue of whether the Trust paid excessive trustee fees was stipulated by the parties and an accounting was rendered by the trustees. The parties, however, dispute the classification of the 710 shares of stock in the cooperative apartment located at 10 E. 70th Street, New York City, New York. DuPont III contends that the property is realty and excluded from the base for computation of trustee fees. Defendants Brady, Garner and SNB contend that the asset conveyed to the Trust was the 710 shares in a cooperative apartment, which under New York law, is personalty.

27. The threshold issue before the Court is which law governs the characterization as realty or personalty of the cooperative apartment. Texas conflicts of law principles are dispositive of a choice of law issue in diversity cases. *Klaxton Company v. Stentor Electric Manufacturing, Inc.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

28. Although the law on this issue is not clearly defined, several courts have concluded that the law of the situs of the property should govern the issue of characterization of the property as realty or personalty. *See Commissioner v. Skaggs,* 122 F.2d 721 (5th Cir.1941), *cert. denied,* 315 U.S. 811, 62 S.Ct. 796, 86 L.Ed. 1210 (1942); *Teas v. Kimball,* 257 F.2d 817 (5th Cir. 1958). *See also, Backar v. Western States Producing Co.,* 382 F.Supp. 1170 (W.D. Tex.1974), *aff'd,* 547 F.2d 876 (1977) (holding that under the RESTATEMENT (SECOND) OF CONFLICTS OF LAWS, the classification of commissions earned on a contract for the sale of oil and gas leases as realty or personalty is governed by the

law of the place of execution of the contract notwithstanding the interests of the law of the situs of the property). One commentator, noting the *Backar* decision in *Annual Survey of Texas Law: Conflicts of Laws*, 30 S.W.L.J. 268, concluded that the *Backar* Court misread the law and that the law of the situs should govern the classification of the property as realty or personalty.

■ The RESTATEMENT (SECOND) OF CONFLICTS OF LAWS, § 222, comment g ("Restatement"), provides that property will be classified as a movable or immovable based on the law selected by application of the principles stated in § 7. Based on the cited precedent and the principles of the Restatement § 7, the Court concludes that the jurisdiction with the most significant relationships to the cooperative property is New York and the law of the State of New York should apply to the characterization issue. *Cf, Gutierrez v. Collins*, 583 S.W.2d 312 (Tex.1979) (adopting most significant relations test of the Restatement in tort cases).

■ 29. Under the law of the State of New York, shares of a cooperative apartment corporation are classified as personalty. *See Stockton v. Lucas*, 482 F.2d 979 (Em.App.1973); *State Tax Commissioner v. Shor*, 53 A.D.2d 814, 385 N.Y.S.2d 290, 291 (1975) (affirming New York Supreme Court's decision, 84 Misc.2d 161, 378 N.Y.S.2d 222 (1975) that shares of a cooperative apartment are not a chattel real within the meaning of N.Y.Civ.Prac.R. § 105(r) (McKinney Supp.1982–83), which provides that real property includes chattels real), *aff'd* 43 N.Y.2d 151, 400 N.Y.S.2d 805, 371 N.E.2d 523 (1977). *See also Silverman v. Alcoa Plaza Associates*, 37 A.D.2d 166,

172, 323 N.Y.S.2d 39, 45 (1971) ("cooperative apartment stock is nevertheless stock, like any other stock in a corporation"). *In re Miller's Estate*, 205 Misc. 770, 130 N.Y. S.2d 295 (Sup.Ct.1954) (shares of stock in cooperative apartment organization considered personalty for estate distribution). Accordingly, the Court concludes that under the terms of the Trust the 710 shares in the cooperative apartment at 10 E. 70th Street should be included in the base for computation of trustee fees.

### F. *DuPont IV's Counterclaims.*

30. DuPont IV seeks to have the Court declare the Trust valid and enforceable and to order duPont III to declare that all assets, which duPont III testified he intended to convey to the Trust, were validly conveyed and to order duPont III to complete any necessary documents effectively to convey the assets. The act that the settlor must perform in order to vest the desired property in the trustees is a question governed by the law of assignment and conveyance.

■ 31. It is well settled that "[w]hen a donor intends to make a gift but the gift is ineffective in whole or in part for any reason, ... no relief is available in favor of the intended donee against the donor himself in order to perfect the gift, 4 Palmer, § 18.8, p. 44,[6] except under certain conditions such as where the intended donee has changed his position in reliance on the intended gift, *id.*, § 18.8, p. 45. *See, Carter v. McDonald*, 172 S.W.2d 767 (Tex.Civ.App. —El Paso, 1942, writ ref'd) (the court concluded that the grantee of a voluntary conveyance cannot maintain an action against the grantor to reform an instrument). *See also, Cooper v. Durham*, 565 S.W.2d 308,

---

**6.** The commentary continues with a succinct summary of the law and rationale:

"The reason [for this rule] ... is fairly apparent: if an intended gift fails to take effect so that title remains in the donor, it would be extraordinary for the law to take the position that because a donor once intended a gift which he failed to complete, he can be forced to complete it. The property is his, he is privileged to change his mind, and no court,

when the issue is seen clearly, will give relief which has the result of compelling a donor to make a private gift merely because he once intended or attempted such a gift. (citation omitted). As one Court said, 'it is merely a failure in a bounty, which, as the grantor was not bound to make, he is not bound to perfect.'" Quoting *Adair v. McDonald*, 42 Ca. 506, 507 (1871).

313 (Tex.Civ.App.—Eastland 1978, writ ref'd n.r.e.) (a promise to give is unenforceable without consideration, citing *Fleck v. Baldwin*, 141 Tex. 340, 172 S.W.2d 975 (1943)).

32. In the case before the Court, duPont III contests the conveyances into the Trust of the Nemours Plantation, his limited partnership interest in Harridge House Associates, and his stock certificates in General Motors, duPont and Raychem.

■ The Court concludes that the transfers of the stock certificates were effective and complete since the evidence indicates that they were held by a SNB nominee and the transfer of the certificates pursuant to duPont III intentions in 1973 would be effected by a bookkeeping entry. However, this does not affect the decision with regard to the Harridge House Associates and the Nemours Plantation.

33. Conveyance of these assets is determined under Texas conflicts of law rules by the law of conveyancing for the situs of the property.[7] *See* Conclusion of Law 28, *infra.*

■ (a) In the case of Harridge House Associates, the facts indicate that the property was ineffectively conveyed to the Trust since the general partner failed to sign the conveyance, finding of fact 32 and 33, and the trustees failed to recognize the validity of the transfer until 1979, finding of fact 35.

■ (b) In the case of Nemours Plantation, the facts, as found, indicate that the property was not effectively conveyed to

the Trust because duPont III's spouse failed to renounce her dower interests in the property,[8] and the trustees failed to exercise or attempt to exercise control over the property until 1979, see findings of fact 31.

Since equity will not intervene to compel a grantor to complete a gift, the Court will not compel duPont III to complete the ineffective conveyances in light of his change of mind.

34. DuPont IV seeks punitive damages against duPont III arguing that the allegations in his complaint are wanton, malicious and unfounded. The Court disagrees and concludes that duPont IV is not entitled to recovery of punitive damages.

■ 35. Finally, the Court is of the opinion that duPont IV is not entitled to recovery of attorney fees especially in light of the fact that litigation expenses have been charged against the income account of the Trust and duPont III is the income account beneficiary.

36. Any finding of fact, in whole or in part, which is deemed a conclusion of law is hereby adopted as a conclusion of law.

7. Under Texas conflicts of laws rules, conveyancing of real property is governed by the law of the situs of the property. *See generally,* Conflicts of Laws, 12 Tex.Jur.3d § 7 (1981). The law of the situs should govern the extent of the settlor's power to convey property and the forms and solemnities necessary to give the conveyance effect. *Cf., Boman v. Gibbs,* 443 S.W.2d 267, 271 (Tex.Civ.App.—Amarillo 1969, writ ref'd n.r.e.).

8. DuPont III filed Civil Action No. 81–CP–7–1193 in the Court of Common Pleas, County of Beaufort, State of South Carolina, seeking (i) to have a Deeds of Transfer dated January 3, 1973, DuPont III Exhibits 8, 9 and .10, which were

recorded under a consolidated deed dated May, 1979, declared null, void and of no effect and (ii) an order requiring the trustees to account for and return any and all monies, if any, received as a result of the transfer of the real estate to the Trust. Defendant Brady filed a motion for stay of collateral proceedings under 28 U.S.C. § 2283 (1976). Since the State of South Carolina has primary interest in determining legal title to the property located within its sovereign jurisdiction, the Court considers it appropriate to defer to the judgment of the Courts of South Carolina to determine title to the Nemours Plantation.