NUMBER 13-98-022-CV

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI

 ___________________________________________________________________ 



JACK L. STONE, Appellant, 



v.

 

THOMAS E. KING, Appellee. 

___________________________________________________________________ 



On appeal from the 214 th District Court

of Nueces County, Texas.

 ___________________________________________________________________ 



O P I N I O N

 Before Chief Justice Seerden and Justices Yañez and Rodriguez 

Opinion by Justice Yañez

 

 Thomas E. King (King), appellee and cross-appellant, filed suit against Jack L. Stone (Stone), appellant and
cross-appellee, alleging causes of action for fraud, conversion, and breach of fiduciary duties arising from the King-Texas
Trust and seeking to remove Stone as trustee. King also sought termination of a Property Management and Lease
Agreement (PMLA) between related parties, King South Plaza, L.L.C. (KSP)(1) and Texas Capital Management (TCM).(2) 
Neither KSP nor TCM were joined in the action. Stone counterclaimed, alleging he was entitled to compensation as
trustee, damages in connection with the PMLA, and attorney's fees for defending the trust. Following a bench trial, the trial
court ordered: (1) Stone's resignation as trustee; (2) termination of the PMLA between KSP and TCM; (3) that Stone and
TCM recover $90,000 in contract damages from King, and that King recover $37,800 from Stone and TCM, with a net
judgment of $52,200 in favor of Stone and TCM; and (4) that the judgment amount earn six percent per annum
post-judgment interest from the date of judgment. Both parties appeal the judgment. We affirm in part and reverse in part. 

 King won the Texas Lottery in 1994. After receiving his first lotto payment, he lost money on a high-risk investment and
had to obtain a loan until the next lotto payment. King's acquaintance with Stone began when King's girlfriend, Virginia de
la Riva, hired Catherine D'Unger, a private investigator and Stone's fiancee, to do some investigative work. King was
interested in investing in commercial real estate, and initially hired Stone as a financial advisor. King hired an attorney to
draft the King-Texas Trust to hold King's winnings and permit investment in real estate. The trust was set up with Stone
and King as co-trustees, with all actions to be taken jointly. D'Unger was appointed as first alternate trustee in the event
that either Stone or King failed to serve under the trust. The trust named King as the sole beneficiary, and required him to
submit a written request to Stone for all withdrawals in excess of a $300,000 annual limit for living expenses. The trust
provided that the trustees were to serve without compensation. Stone and King developed a 19-year "business plan," which
purportedly provided for the investment of trust assets of $250,000 per year in commercial real estate under Stone's
management. Under the terms of the trust, Stone, a licensed real estate broker, was to earn the usual and customary fees
due to a broker for engaging in real estate transactions on behalf of the trust. 

 The trust formed KSP, which purchased Office Park South (the property), a commercial property consisting of two office
buildings in Corpus Christi, Texas. The property was purchased for $900,000, with a cash down payment of $250,000 and
the balance financed by KSP. Stone received an $18,000 brokerage fee from the seller in connection with the sale. Stone
and King signed the PMLA on behalf of TCM and KSP respectively. The PMLA made TCM the manager and leasing
agent for the property, and provided that if the property was sold prior to termination of the agreement, TCM was entitled
to a fee equal to six percent of the gross sales price. It also provided that TCM was entitled to five percent of the monthly
gross revenues for day-to-day management and leasing services on the property. 

 King testified he initially asked Stone to resign as trustee because without King's approval, Stone added D'Unger as a
signatory to the trust's checking account. Stone's action was precipitated by King's use of an American Express credit card
he borrowed from D'Unger. King had planned a trip to the Phillippines, but did not have a credit card to use for travel and
emergency expenses. D'Unger loaned him an extra card on her American Express account, with the understanding
(according to Stone) that he use it for emergency expenses only. King ran up expenses of $2418.85 on the card. Stone
claims American Express demanded immediate payment, and because King could not be located, Stone added D'Unger as a
signatory on the trust account and wrote a trust check to American Express for $2698.49. King was unaware the payment
had been made, and later sent American Express a check for $2247.10, resulting in an overpayment. American Express
refunded $1725.53 of the overpayment, which was deposited in the trust account. The transactions thus resulted in an
overpayment from the trust funds of $800.21, which was not refunded by Stone or D'Unger. The trial court found the loss
of these funds to the trust and Stone's addition of D'Unger to the account were breaches of Stone's fiduciary duty. 

 King became dissatisfied with Stone's performance as trustee. Stone wrote a letter to King, in which Stone acknowledged
that he had received a written request for a $14,000 draw on trust funds. In the letter, Stone advised King he was "alarmed
at the high rate of withdrawals" and would "evaluate" the request for the draw. He also wrote that because King was
represented by counsel, he felt it was necessary to seek representation on behalf of the trust, and that the expenses incurred
in defending the trust would be paid with trust funds. Pursuant to advice from his attorney, Stone obtained $37,000 from
the Office Park South reserve account, owned by KSP, and used a portion of those funds to pay legal expenses incurred in
defending against King's actions. 

 King sued Stone, alleging Stone had violated his duties as trustee. King also requested termination of the PMLA. Stone
counterclaimed, alleging breach of the trust, breach of the assignment of the lottery payments, and breach of the business
plan. Stone also sought damages allegedly incurred acting on behalf of the trust. 

 Following a bench trial, the trial court rendered judgment. Stone filed a motion for new trial, alleging KSP was a
necessary party to the judgment. KSP filed an "Acknowledgment of Virtual Representation," subjecting itself to the
judgment. Stone then filed an amended motion for new trial, in which he complained for the first time that TCM was a
necessary party to the suit. 

 The trial court issued findings of fact and conclusions of law, which included the following: 

1. Thomas King established and funded the King-Texas Trust. The trust indenture provided for two trustees, who were
required to make payments to Thomas King, as beneficiary, upon his written demand. . . . The Court finds the King-Texas
Trust is a valid trust. The trust indenture's provision regarding the assignment of lottery winnings, however, is invalid as a
matter of law. 



2. . . . Jack Stone's resignation as a trustee of the King-Texas Trust should be, and is, accepted and confirmed as the order
of this Court. 



3. The Court finds the Property Management and Leasing Agreement between Texas Capital Management (TCM) and
King South Plaza, LLP (KSP), is valid. Jack Stone, individually and on behalf of TCM, asked this court to relieve him of
liability under the Property Management and Leasing Agreement because of incompatibility with the property owner. 
TCM was joined as shown in the record, and TCM's rights were heard by consent of Jack Stone, having made such requests
in open court. When brought to the attention by the court, Stone on the record stated he was the sole owner; therefore, no
conflict of interest exists between Stone and TCM. The Court finds that all parties were before the court. The parties
present before the court enable it to adjudicate fairly and fully the questions involved in the continuation of the leasing
agreement. KSP had privity of interest with and was virtually represented by Thomas King. TCM had privity of interest
with and was virtually represented by Jack Stone. All parties have requested the court to declare the agreement void and to
release them from further responsibilities under the contract. The contract is hereby declared to be of no further effect as of
October 31, 1997. Jack Stone shall return all documents, books of account, funds, and other items pertaining to the
operation of Office Park South, which shall be turned over in good order to Thomas E. King or his designee by 4:00 p.m.
on October 31, 1997, or immediately upon Jack Stone's failure to maintain a bond to supersede the judgment. 



4. Jack Stone breached the Property Management and Leasing Agreement and his fiduciary responsibilities as trustee by
converting funds in the amount of THIRTY-SEVEN THOUSAND & NO DOLLARS ($37,000.00) held on behalf of King
South Plaza, LLC, for his own use. Jack Stone breached the King-Texas Trust by failing to distribute trust funds to
Thomas King when directed to do so in writing. Jack Stone further breached the King-Texas Trust by allowing his fiancé
[sic] to become a signatory on the trust's checking account to pay a debt which Thomas King separately paid, resulting in
Thomas King's paying the debt twice. This action by Jack Stone was done without authorization by Thomas King and there
has been no repayment of the duplicate payment. The amount of the unreimbursed debt is EIGHT HUNDRED & NO/100
DOLLARS ($800.00). 



5. Thomas King had no contracts with Jack Stone or Texas Capital Management apart from the King-Texas Trust and the
Property Management and Leasing Agreement. Other contractual agreements alleged by Jack Stone, had they existed,
would be barred by the statute of frauds. Thomas King has not breached any agreement with Jack Stone or Texas Capital
Management. Jack Stone has no claim for quantum meruit recovery from Thomas King. 



6. The Court finds Jack Stone and Texas Capital Management should recover $90,000 from Thomas E. King, such amount
being the future value of the Property Management & Leasing Agreement to Stone. 



 This amount is calculated as a six-percent broker's fee on the sale of the building, which is assumed to have a value of
$1,500,000. 



7. The Court further finds Thomas E. King should recover $37,800 from Jack Stone and Texas Capital Management on
account of his conversion of funds. 



8. The Court further finds that there is no evidence to support the award of attorneys' fees to Jack Stone, and, therefore,
none are awarded. The Court also finds that an award of attorneys' fees to Jack Stone would be neither equitable nor just,
and there is no legal basis for an award of attorneys' fees. 



9. The Court, having credited the $37,800 against the $90,000, finds that Jack Stone and Texas Capital Management
should recover from Thomas E. King the sum of FIFTY-TWO THOUSAND TWO HUNDRED DOLLARS ($52,200). 



10. This judgment shall earn post-judgment interest of six percent (6%) per annum from the date of judgment until
payment since the net recovery by Jack Stone arises by contract. Costs are adjudged against the party incurring same since
each party has obtained partial relief. All other relief requested is denied. 



 In twelve issues, Stone contends: (1) the evidence is legally and factually insufficient to support the trial court's finding
that he breached his fiduciary duty to King under the trust; (2) the trial court erred in enjoining him from acting as trustee;
(3) the trial court erred in holding he is not entitled to contract or quantum meruit damages under the trust agreement; (4)
the trial court's finding that King and/or KSP did not breach any agreement with Stone or TCM is against the great weight
and preponderance of the evidence; (5) the trial court erred in failing to enforce King's assignment of lottery payments to
fund the trust; (6) the trial court erred in failing to enforce the business plan; (7) the trial court erred in holding he and TCM
are entitled to only $90,000 in contract damages; (8) the evidence is legally and factually insufficient to support the trial
court's finding that he breached the agreements by using trust funds to defend the trust; (9) the trial court erred in finding
King and/or KSP did not breach the PMLA; (10) the trial court abused its discretion in finding no legal basis for awarding
him attorney's fees; (11) the trial court erred in holding the post-judgment interest should bear at a rate of six percent (6%)
per annum, rather than ten percent (10%) per annum; and (12) the trial court had no jurisdiction to adjudicate the contract
between TCM and KSP because those entities were not joined as parties. 

 King also appeals, contending, in a single issue, that the evidence is legally and factually insufficient to support an award
of damages to Stone when the trial court found no breach of contract by King and no basis for recovery in quantum meruit
by Stone. 

I. JURISDICTION

 We begin by addressing Stone's twelfth issue, in which he challenges the trial court's jurisdiction to adjudicate the contract
issues arising from the PMLA because the parties to the contract, TCM and KSP, were not joined as parties to the lawsuit. 
Stone contends the trial court erred in concluding that KSP was "virtually represented" by King, that TCM was "virtually
represented" by Stone, and that "all parties were before the court." 

 King argues Stone failed to preserve any error for review because he waited until after trial to object concerning the court's
jurisdiction, even though King had sought relief asking the court to rescind the PMLA and Stone had also sought the same
relief. In his Second Amended Petition, King asked the court to terminate, rescind, or modify the PMLA because of Stone's
misconduct. Stone filed answers, but failed to complain about a defect of parties. Thereafter, Stone filed his Second
Amended Original Counter-Petition, in which he requested relief on behalf of TCM against King and KSP regarding the
PMLA. Stone first complained that KSP was a necessary party in a motion for new trial; however, he did not complain of
any defect of parties concerning TCM. After KSP subjected itself to the judgment by filing an "Acknowledgment of Virtual
Representation," Stone filed an amended motion for new trial, in which he complained for the first time that TCM was a
necessary party to the lawsuit. 

 To preserve a complaint for appellate review, a party must have presented to the trial court a timely request, objection, or
motion stating the specific grounds for the ruling desired. Tex. R. App. P. 33.1(a). A complaint concerning a defect of
parties is properly brought to the attention of the trial court by a verified plea in abatement. Tex. R. Civ. P. 93(4); Jones v.
LaFargue, 758 S.W.2d 320, 324 (Tex. App.--Houston [14th Dist.] 1988, writ denied). When a party makes no objection to
the trial court as to the absence of an indispensable party, it will not be heard to complain on appeal. Pirtle v. Gregory, 629
S.W.2d 919, 920 (Tex. 1982); Jones, 758 S.W.2d at 324. The absence of an indispensable party does not deprive the trial
court of jurisdiction and it is not fundamental error for the trial court to proceed to judgment in such a case. Pirtle, 629
S.W.2d at 920; Jones, 758 S.W.2d at 324. 

 Here, Stone first raised the issue of the joinder of KSP and TCM in his motions for new trial. Even though he did raise the
issue at trial, he did not preserve the issue for review because his complaint of the non-joinder was not timely and because
he made no effort to join KSP and TCM as parties. See Gomez v. Kestermeier, 924 S.W.2d 210, 212 (Tex. App.--Eastland
1996, writ denied). We hold Stone waived any right to complain on appeal of the non-joinder of KSP and TCM, and
overrule his twelfth issue. 

II. KING'S CLAIMS AGAINST STONE

 Sufficiency of the Evidence

 We next address Stone's first, second, and eighth issues, challenging: 1) the legal and factual sufficiency of the evidence
supporting the trial court's finding that he breached his fiduciary duty as a trustee; 2) the trial court's order enjoining him
from acting as trustee; and 3) the legal and factual sufficiency of the evidence supporting the finding that he breached the
PMLA and his fiduciary duties by using trust funds to defend the trust. 

 Standard of Review

 Findings of fact are reviewable for legal and factual sufficiency of the evidence by the same standards that are applied in
reviewing the evidence supporting a jury's answer. Asai v. Vanco Insulation Abatement, Inc., 932 S.W.2d 118, 121 (Tex.
App.--El Paso 1996, no writ); Zieben v. Platt, 786 S.W.2d 797, 799 (Tex. App.--Houston [14th Dist.] 1990, no writ). 
Conclusions of law are reviewed de novo. Asai, 932 S.W.2d at 121. 

 In a bench trial, the trial judge passes on the witnesses' credibility and the weight given the witnesses' testimony, and can
reject or accept any witnesses' testimony in whole or in part. In re Cummings, 13 S.W.3d 472, 476 (Tex. App.--Corpus
Christi 2000, no pet.) (citingBocquet v. Herring, 972 S.W.2d 19, 22 (Tex. 1998)). When confronted with conflicting
testimony, we defer to the determination of the trial judge, who is the sole judge of the credibility of the witnesses.
Maeberry v. Gayle, 955 S.W.2d 875, 880 (Tex. App.--Corpus Christi 1997, no writ) (citations omitted). While an appellate
court may not have reached the same findings, it may not substitute its judgment for the trial court's judgment. Humphrey
v. Camelot Retirement Community, 893 S.W.2d 55, 58 (Tex. App.--Corpus Christi 1994, no writ). 

 When we review a legal sufficiency challenge, we consider all the evidence in the record in a light most favorable to the
party in whose favor the verdict has been rendered and indulge every reasonable inference in that party's favor. See
Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc., 960 S.W.2d 41, 48 (Tex. 1998). Anything more than a
scintilla of evidence is legally sufficient to support the finding. Id. When confronting a factual insufficiency challenge, we
overturn findings only if they are so against the great weight and preponderance of the evidence as to be clearly wrong and
unjust. Ortiz v. Jones, 917 S.W.2d 770, 772 (Tex. 1996). 

Breach of Fiduciary Duty

 Fiduciary duties arise as a matter of law in certain formal relationships, including trustee relationships. Insurance Co. of
N. Amer. v. Morris, 981 S.W.2d 667, 674 (Tex. 1998). "Trustees and executors owe beneficiaries a fiduciary duty of full
disclosure of all material facts known to them that might affect the beneficiaries' rights." Huie v. Deshazo, 922 S.W.2d
920, 923 (Tex. 1996) (internal brackets and quotations omitted). 

 In the present case, the trust provides that it is governed by the provisions of the Texas Trust Code. See Tex. Prop. Code
Ann. § 101.001-115.017 (Vernon 1995 and Supp. 2000). The proper standard against which a trustee is measured is that of
an ordinary person in the conduct of his own affairs. Id. at § 113.056; Hoenig v. Texas Commerce Bank, N.A., 939 S.W.2d
656, 661 (Tex. App.--San Antonio 1996, no writ). 

 The trial court found Stone breached the PMLA and his fiduciary duties by: 1) payment of the American Express bill and
the addition of D'Unger on the trust account to pay that bill; 2) failure to disburse all monies requested on demand; and 3)
use of trust funds to defend against King's claims. It is undisputed that Stone added D'Unger as a signatory to the trustees'
checking account and that they jointly paid the American Express bill without authorization from King. Stone testified that
American Express put a hold on the account because of King's excessive use of the card for expenses which were not
authorized by D'Unger, such as a visit to a local spa and the purchase of exotic underwear for King's girlfriend. Stone
testified it was necessary to pay the American Express bill in order to free D'Unger's account, that he and D'Unger were
unable to locate King, and that the trust agreement authorized D'Unger to serve as an alternate trustee in such
circumstances. 

 King testified D'Unger authorized him to use the card for trip-related expenses, including emergencies, and that after
D'Unger learned of the hold on the card, she immediately paged him and discussed the matter with de la Riva by telephone. 
King testified he wanted the debt paid, but that he did not authorize Stone to add D'Unger as a signatory on the trust
account to pay the debt. 

 The trust provides that all actions of the trust are to be undertaken jointly by the co-trustees, Stone and King. The trust
also authorizes D'Unger to serve as alternate trustee if either trustee "fail[s] or cease[s] to serve." Viewed in the light most
favorable to the trial court's conclusion, we conclude the evidence is legally and factually sufficient to establish Stone
breached his fiduciary duty by adding D'Unger to the trust account to pay the bill. The trial court was free to accept King's
testimony that he and de la Riva were available by telephone. Stone could have sought King's permission to add D'Unger
to the trust account, or consulted with King to arrange for payment of the bill. Stone argues he had no obligation to
advance the $800.21 refund to the trust because the debt resulted from King's unauthorized expenditures and at the time of
trial, the excess amount was still being held by American Express to secure the account. Stone offered no documentary
evidence, however, to support his assertion that American Express had failed to credit the account for the overpayment. 
Even if we accept Stone's assertion, no overpayment would have occurred if he had discussed payment of the debt with
King. 

 The trial court also found Stone breached his fiduciary duty by failing to disburse trust fund monies after being directed to
do so in writing. Stone admits receiving a handwritten note on July 28, 1995, requesting a distribution, but contends he
was justified in failing to make the requested disbursement in a timely fashion because: (1) the request was written by de la
Riva, not King; and (2) the request for a distribution exceeded the budget set out in the business plan. The note was not
introduced into evidence. King argues Stone waived any challenge to the validity of the request because he failed to object
based on the "best evidence" rule(3) at trial, and had he done so, the objection would have been overruled because the
original note was in Stone's possession. We conclude, however, that it is unnecessary for us to determine whether King
submitted the handwritten request because Stone admitted at trial that his attorney received a letter dated August 9, 1995,
from King's attorney, requesting a disbursement. Stone testified he withheld payment until February 1996 because King
had not responded to his questions concerning the availability of other income.(4) 

 The trust provides for distributions to King of "so much of the trust income and principal" as he may direct from time to
time in writing. It also provides that "[i]n determining the amount of any distribution to be made for [King's support], . . .
the trustees may consider other funds available to [King] for such purposes . . ." The provision requiring distributions upon
King's written request, however, is not subject to any other provision. Moreover, the "business plan" (which is neither
attached to, nor incorporated into, the trust agreement) simply reflects projections for "sources of funds" and "uses of
funds" for the period March 1995 through February 1996. Viewed in the light most favorable to the trial court's conclusion,
we conclude the evidence is legally and factually sufficient to establish that Stone breached his fiduciary duty by failing to
distribute trust funds to King when directed to do so in writing. 

 The trial court also found Stone breached his fiduciary duties as trustee and the PMLA by converting $37,000 in trust
funds held by KSP for his own use. Stone contends he was entitled to engage the services of an attorney to represent the
interests of the trust and himself in his capacity as trustee, with attorney's fees constituting a trust expense. In support of his
argument, Stone cites section 113.018 of the Texas Trust Code. See Act of May 22, 1999, 76th Leg., R.S., ch. 794, 1999
Tex. Sess. Law Serv. 3417 (amended 1999) (current version at Tex. Prop. Code Ann. § 113.018 (Vernon Supp. 2000)). 
Section 113.018 provides "[a] trustee may employ attorneys . . . reasonably necessary in the administration of the trust
estate." See Tex. Prop. Code Ann. § 113.018 (Vernon Supp. 2000).(5) Stone argues King's effort to remove him as trustee
was an attack on the trust, which he had a duty to defend. 

 King argues that by taking trust funds from KSP to pay lawyers without his approval, Stone violated the trust provision
requiring all actions to be taken jointly. He further argues Stone did not use the funds to defend the trust, but rather, to pay
for an attorney to sue King. 

 The trial court concluded Stone converted $37,000 of KSP funds for his own use. Conversion is the wrongful exercise of
dominion and control over another's property in denial of, or inconsistent with, his rights. Virgil T. Walker Constr. Co. v.
Flores, 710 S.W.2d 159, 160 (Tex. App.--Corpus Christi 1986, no writ). It is undisputed that Stone took approximately
$37,000 from the KSP account for attorneys' fees without King's consent. It is also undisputed that the trust owned
ninety-nine percent of KSP and King individually owned one percent. 

 Under Texas law, a trustee may charge the trust for attorney's fees that the trustee, acting reasonably and in good faith,
incurs defending charges of breach of trust. See Grey v. First Nat'l Bank, 393 F.2d 371, 387 (5th Cir. 1968) (applying
Texas law); DuPont v. Southern Nat'l Bank, 575 F. Supp. 849, 864 (S.D. Tex. 1983), modified, 771 F.2d 874 (5th Cir.
1985); see generally 90 C.J.S. Trusts § 285 (1955). A trustee is not entitled to reimbursement for expenses that do not
confer a benefit upon the trust estate, such as those expenses related to litigation resulting from the fault of the trustee. See
DuPont, 575 F. Supp. at 864. We have concluded that Stone breached his fiduciary duties by failing to distribute trust
funds after being directed to do so by King's attorney and by adding D'Unger as a signatory to the trust account. Thus, the
trial court could reasonably have concluded that the litigation seeking to remove Stone as trustee resulted from Stone's
improper actions, that Stone did not act reasonably and in good faith in incurring the attorney's fees, and was, therefore, not
entitled to charge the trust for the fees. Viewed in the light most favorable to the trial court's judgment, we hold the
evidence is legally and factually sufficient to support the conclusion that Stone breached his fiduciary duties by converting
$37,000 in trust funds for his own use. 

 We also hold that the trial court did not err in enjoining Stone from acting as a co-trustee. We overrule Stone's second
issue. 

Stone's breach of PMLA

 The trial court also concluded that Stone breached the PMLA by using KSP funds to pay for attorney's fees. Stone argues
he cannot be liable for breach of the PMLA because he was not a party to that agreement; the parties to the PMLA were
TCM and KSP,(6) neither of which was a party to the lawsuit. Stone argues that when he used the KSP funds for attorney's
fees, he was acting as a co-trustee, and in his capacity as a co-trustee, was not a party to the PMLA. The trial court found
that "TCM had privity of interest with and was virtually represented by Jack Stone," and that Stone stated on the record that
he was the sole owner of TCM. 

 At trial, King's attorney questioned Stone regarding Stone's counterclaim that King breached the PMLA between KSP and
TCM: 

Q [King's counsel]: Okay. Now, then as-- well, let me ask you this. You have got, in connection with this agreement, it's
between Texas Capital Management? Is that right? Is that--- 



A [Stone]: Between Texas Capital Management and--- 



Q: And King South Plaza, L.L.C.? 



A: Yes. 



Q: Okay. Are you saying that you are the same thing as Texas Capital Management; that it's not a distinct entity? 



A: It's an entity. 



Q: Is it distinct from you? Is it? I don't see where it's a party to this lawsuit. 



A: It's my company. 



Q: Okay. So for purposes of this litigation, we should ignore any technical differences between you and Texas Capital
Management? 



A: That sounds like a legal opinion. I don't know. 



* * * *

 

Q: All right. And are you asking for this compensation, this $30,000 you told the Judge about, are you asking it on the
basis of work that was done under this contract, or not? 



A: Yes, I believe it was extraordinary work done under that contract. 

 The record reflects Stone did not personally state he was the sole owner of TCM; rather, Stone's attorney, during Stone's
cross-examination by King's counsel, stated that Stone was the sole proprietor of TCM: 

[The court]: -- and the trustee, in his capacity as trustee, he made a contract to manage a building. Right? 



[King's attorney]: That's right. 



[Stone's attorney]: No, in his capacity as trustee acting through Texas Capital Management. The contract is between--- 



[The court]: Well, he is-- he is the sole proprietor of Texas Capital Management, isn't he? 



[Stone's attorney]: He is, indeed. 



[The court]: Okay, and they made a contract. Okay? For the management of a building. Right? 



[Stone's attorney]: Right. 



 Moreover, when Stone used funds from the KSP account to pay for attorney's fees, he derived his authority to draw on the
account from his position as general manager of TCM and the PMLA between KSP and TCM. The TCM partnership
agreement identifies Stone as general partner and provides that "[t]he General Partner shall have sole and exclusive control
of the Limited Partnership." It further authorizes the general partner to conduct all partnership business "either in their [sic]
own name or in the name of a nominee, without having to disclose the existence of this Partnership." The minutes of a
KSP "meeting" with its only manager, King, in attendance, reflects approval of the PMLA and authorizes TCM to open a
banking account in KSP's name with TCM's "designated principal" as a signatory on the account. Stone testified he was
paid for his management services out of the KSP account. We conclude that Stone used his authority as general partner of
TCM to withdraw funds from the KSP account. 

 We next address the trial court's conclusion that Stone breached the PMLA by using KSP funds to pay for attorney's fees. 
We find the PMLA provided no authority for Stone's actions. Section fourteen of the PMLA provides for the deposit of all
funds collected on KSP's behalf in an account "maintained for that specific purpose. . ." Section fifteen provides for the
payment of "expenses incurred on [KSP's] behalf in the operation, maintenance, management and leasing of the Property." 
We conclude Stone had no authority under the PMLA to use KSP funds to pay for attorney's fees. Accordingly, we hold
the evidence is legally and factually sufficient to support the conclusion that Stone's use of the KSP funds to pay for
attorney's fees breached the PMLA. We overrule Stone's first and eighth issues. 



III. STONE'S COUNTERCLAIMS AGAINST KING

Assignment of Lottery Payments

 By his fifth issue, Stone contends the trial court erred in concluding that the assignment of lottery payments to the trust
was invalid as a matter of law. King argues that Stone was removed as trustee on March 25, 1996, and therefore lacks
standing to challenge the validity of the trust's provisions regarding the assignment of lottery payments. King also argues
that section 466.406 of the government code prohibits the assignment of lottery payments. See Act of April 28, 1993, 73rd
Leg., R.S., 1993 Tex. Sess. Law Serv. 226 (amended 1999) (current version at Tex. Gov't Code Ann. § 466.406(a) (Vernon
Supp. 2000)). 

 The trial court found Stone was removed as a trustee by its order of March 25, 1996. However, Stone's "Counter-Petition
and Application for a Temporary Restraining Order," in which he sought enforcement of the trust's assignment provisions,
was filed on February 8, 1996, prior to the court's order. King cites Gorman v. Gorman, 966 S.W.2d 858, 865 (Tex.
App.--Houston [1st Dist.] 1998, pet. denied), in support of his argument that Stone lacks standing. We find that King's
reliance on Gorman is misplaced. In Gorman, the trial court found the appellant lacked standing to challenge the granting
of a partial summary judgment because at the time it was granted, he and the appellee had not asserted any cross-claims
against each other. In contrast, Stone's counter-petition, asserting claims under the trust, was filed prior to the order
removing him as trustee. We conclude Stone has standing to challenge the trial court's conclusion that the trust's
assignment provisions are invalid. 

 Section 466.406(a) of the government code provides that "[e]xcept as otherwise provided by this section, the right of any
person to a prize is not assignable." See Act of April 28, 1993, 73rd Leg., R.S., 1993 Tex. Sess Law Serv. 226 (amended
1999) (current version at Tex. Gov't Code Ann. § 466.406(a) (Vernon Supp. 2000)).(7) The trust provides for funding the
trust with property described in "Exhibit A," which provides: 

All right, title and interest in the unpaid amount of sums of LOTTO PAYMENTS, in the gross amount of $14,649,000.00,
payable to THOMAS E. KING by the Texas Lottery Commission as set forth on the attached schedule of payments, dated
March 17, 1994, and identified as "Lotto 6 of 6 Payment Schedule, Draw # 140" is hereby irrevocably assigned to the
irrevocable KING-TEXAS TRUST and such property shall be held and governed strictly and entirely by the terms and
conditions of such Trust Agreement. 



 The issue of whether section 466.406(a) prohibits assignment of lottery payments to the trust is apparently a question of
first impression. Stone argues the provision prohibits only an assignment that purports to require the Texas Lottery
Commission to pay the winnings to someone other than the winner, and that nothing prohibits King from assigning the
lottery winnings once the Lottery Commission has made the payment to him. The language of "Exhibit A," however,
purports to assign "all right, title and interest" in the unpaid lottery payments to the trust, in violation of the specific
provisions of section 466.406(a). We hold the trial court correctly concluded that the assignment of King's lottery winnings
was invalid as a matter of law. We overrule Stone's fifth issue. 

The Business Plan

 By his sixth issue, Stone claims the trial court erred in "failing to enforce the business plan incorporated into the trust." 
Stone contends he is entitled to damages under the business plan in the form of sales commissions and property
management and leasing fees that he could have earned had King performed the contract. Stone argues that under the plan,
King committed to investing $250,000 per year in commercial real estate, investing other trust income as appropriate, and
disbursing approximately $300,000 per year for King's living expenses. King argues the "business plan" existed only in
Stone's imagination. 

 The trial court concluded that, except for the trust and the PMLA, there were no other agreements between King and Stone
or TCM, and that had such agreements existed, as Stone alleges, they would be barred by the statute of frauds. King
testified he had complete discretion regarding decisions to purchase additional property, and had no firm agreement with
Stone to purchase additional property. Neither the trust nor the PMLA incorporates, or even makes reference to, a
"business plan." Stone argues enforcement of the "business plan" is not barred by the statute of frauds because he
performed in accordance with his part of the plan, and an agreement otherwise barred by the statute of frauds is rendered
enforceable by partial performance. We are unpersuaded by Stone's arguments. As noted, evidence of the "business plan"
introduced at trial consisted solely of a document reflecting projected funds and expenditures for March 1995 through
February 1996. We conclude the trial court did not err in failing to enforce the "business plan." We overrule Stone's sixth
issue. 

No Breach by King and/or KSP

 By his fourth and ninth issues, Stone challenges the trial court's conclusion that neither King nor KSP breached the PMLA
or any other agreement with Stone or TCM. Stone argues that he suffered the loss of usual and customary brokerage fees
he was entitled to under the trust and business plan because King failed to abide by the terms of the trust and the business
plan. Stone also argues he was entitled to compensation for services he provided in repairing the KSP office building after
a fire. 

 We conclude that the trial court properly found King did not breach the PMLA or any other agreement with Stone or TCM. 
Under the trust, Stone was only entitled to usual and customary brokerage fees for his services in the purchase, sale,
management, and leasing of trust properties. As discussed, the "business plan" was simply a projection of income and
expenditures for a one-year period; it created no obligation for King or the trust to invest in other properties. Stone was not
entitled to additional compensation for the services he provided in repairing the building after the fire because the PMLA
required Stone to make or attend to "ordinary and emergency repairs." We hold the trial court did not err in concluding that
King did not breach any agreement with Stone or TCM. We overrule Stone's fourth and ninth issues. 

Damages

 By his seventh issue, Stone challenged the trial court's finding that he and TCM were entitled to recover only $90,000 in
damages from King for future value of the PMLA. The trial court based its calculation of damages on a six-percent
broker's fee on the sale of the property, which was "assumed" to have a value of $1.5 million. 

 We review an award of damages as a challenge based upon the sufficiency of the evidence, and will reverse an award of
damages only if it so against the great weight and preponderance of the evidence as to be manifestly unjust. International
Freight Forwarding, Inc. v. Amer. Flange, 993 S.W.2d 262, 271 (Tex. App.--San Antonio 1999, no pet.). 

 Stone testified the projected future value of the PMLA was $280,000, an amount which included the $90,000 broker's fee
for the projected sale of the property. He also testified he arrived at the $280,000 figure based on average lease
commissions and management fees projected over the four and one-half years remaining on the property's seven-year
financing term. Stone admitted the court's finding he was entitled to $90,000 is based on an "assumed" property sale value
of $1.5 million. Stone argues, however, that the finding is "supportable" because the fair market value of the property at
the time of trial was $1.29 million, and the property's value would increase over the remaining four and one-half years of
the financing term. 

 King argues no finding of fact by the trial court supports the award of $90,000 in damages to Stone. King also contends
there is no evidence to support the court's "assumed" valuation of the property at $1.5 million. We agree. The record
contains no evidence to support the $1.5 million valuation which formed the basis for calculating Stone's damages. 
Moreover, Stone is not entitled to any recovery for breach of the broker's fee provision of the PMLA because the trial court
found King did not breach the PMLA. The PMLA provides that "if the Property is sold prior to the termination of this
Agreement," Stone is entitled to "a fee equal to 6% of the gross sales price of the Property." The property was not sold,
however, prior to termination of the PMLA by the court. We hold there is no evidence to support the trial court's finding
that Stone and TCM should recover $90,000 from King. We overrule Stone's seventh issue and sustain King's sole issue. 

 By his third issue, Stone challenges the trial court's conclusion that he was not entitled to contract or quantum meruit
damages under the trust agreement. 

 Quantum meruit is an equitable theory of recovery which is based on an implied agreement to pay for benefits received. 
Heldenfels Bros., Inc. v. City of Corpus Christi, 832 S.W.2d 39, 41 (Tex. 1992). To recover under the doctrine of quantum
meruit, a plaintiff must establish that: 1) valuable services and/or materials were furnished; 2) to the party sought to be
charged; 3) which were accepted by the party sought to be charged; and 4) under such circumstances as reasonably notified
the recipient that the plaintiff, in performing, expected to be paid by the recipient. Id.

 Stone argues he was entitled to a usual and customary fee called a "carry" for locating and brokering the KSP property. He
also contends he was entitled to a customary fee of five percent of the insurance policy proceeds for his services related to
the fire repairs. In response to Stone's claim in connection with the purchase of the property, King argues that Stone was
compensated by the seller, and that there was no agreement for Stone to receive additional compensation from King. Stone
admitted at trial that he was paid a fee by the seller and that he and King did not discuss any expectation for additional
compensation in connection with the purchase. Stone failed to prove King implicitly promised to pay for Stone's services,
and thus failed to establish an essential element for a quantum meruit recovery. We also find that Stone is not entitled to
recover in quantum meruit for his services related to the fire because those services were governed by the PMLA. Recovery
on an express contract and on quantum meruit are inconsistent. Tatum v. Tatum, 606 S.W.2d 31, 33 (Tex. Civ.
App.--Corpus Christi 1980, no writ). Where there exists a valid express contract covering the subject matter, there can be
no implied contract. Id. We hold the trial court did not err in concluding that Stone was not entitled to contract or quantum
meruit damages under the trust agreement. We overrule Stone's third issue. 



Attorney's Fees

 By his tenth issue, Stone complains the trial court improperly failed to award him attorney's fees. Stone argues an award of
attorney's fees was proper under section 38.001 of the civil practice and remedies code. 

 Section 38.001 provides for the recovery of attorney's fees associated with a successful claim on an oral or written contract.
See Tex. Civ. Prac. & Rem. Code Ann. § 38.001 (Vernon 1997). To obtain an award of attorney's fees under section
38.001, a party must meet two requirements: (1) it must prevail on a cause of action for which attorney's fees are
recoverable; and (2) it must recover damages. See Green Intern. Inc. v. Solis, 951 S.W.2d 384, 389 (Tex. 1997). When a
claim under section 38.001 is successful, a trial court has the discretion to determine the proper amount of attorney's fees. 
See World Help v. Leisure Lifestyles, Inc., 977 S.W.2d 662, 683 (Tex. App.--Fort Worth 1998, pet. denied). Additionally,
when a claim is successful, and reasonable fees are proven, a trial court has no discretion to deny the fees. Id. Attorney's
fees are available for defense of a claim or counterclaim when both the claim and counterclaim are contractual and arise
from the same transaction or set of facts. Pegasus Energy Group, Inc. v. Cheyenne Petroleum, 3 S.W.2d 112, 130 (Tex.
App.--Corpus Christi 1999, pet. denied). 

 Because we have sustained King's challenge to the determination that Stone and TCM should recover $90,000 in damages
from King, Stone did not prevail on his counterclaims. Similarly, he did not prevail in his defense against King's claims. 
We hold Stone is not entitled to attorney's fees, and overrule his tenth issue. 

Post-Judgment Interest

 By his eleventh issue, Stone contends the trial court erred in awarding post-judgment interest at a rate of six percent (6%)
per annum because the appropriate rate of post-judgment interest on a contract claim is ten percent (10%). Because we
reverse that portion of the trial court's judgment that awarded Stone $90,000 in damages, we need not address this issue. 
See Tex. R. App. P. 47.1. 

 The trial court credited King's recovery of $37,800 against the $90,000 awarded to Stone and TCM, and ordered that Stone
and TCM recover $52,200 from King. Because we reverse that portion of the judgment awarding damages to Stone and
TCM, and affirm that portion of the judgment awarding damages to King, we must determine the post-judgment interest
rate applicable to King's $37,800 judgment. 

 Post-judgment interest is mandated by statute, and is recoverable whether or not specifically awarded in the judgment. 
Staff Indus., Inc. v. Hallmark Contracting, Inc., 846 S.W.2d 542, 551 (Tex. App.--Corpus Christi 1993, no writ). In the
present case, King is entitled to post-judgment interest on the amount of monetary damages awarded to him, even if the
judgment does not so recite. Id. Accordingly, we may correct or reform the judgment to reflect an award of post-judgment
interest. Id.; see Tex. R. App. P. 43.2(b). Based on article 5069.105, section 2 of the Texas Revised Civil Statutes(8) and
the Texas Register,(9)

we find King is entitled to an award of post-judgment interest of ten percent per annum on the $37,800 judgment awarded
in his favor. 

 We modify the judgment to award King post-judgment interest of ten percent per annum on the $37,800 judgment awarded
in his favor, modify the judgment to delete the award of $90,000 to Stone and TCM, and as modified, affirm the judgment. 



________________________ 

LINDA REYNA YAÑEZ 

Justice 



Do not publish. 

Tex. R. App. P. 47.3. 



Opinion delivered and filed this 

the 30th day of November, 2000. 

 

1. King South Plaza, L.L.C. (KSP) is a Texas limited liability company. One percent of KSP is owned by King; the
remaining ninety-nine percent is owned by the King-Texas Trust. 

2. Texas Capital Management (TCM) is a Texas family limited partnership between Stone and his fiancee, Catherine
D'Unger. The limited partnership agreement identifies Stone as general partner of TCM and D'Unger as a limited partner.

3. See Tex. R. Evid. 1003.

4. Stone responded to the note by sending a letter to King, in which he told King he was "alarmed at the high rate of
withdrawals" and needed additional information about other sources of income in order to "evaluate" the request for a
disbursement. In the letter, Stone also advised King that it had become necessary for Stone to hire legal counsel to represent
him in his "capacity as co-trustee."

5. The 1999 amendment had no effect for purposes of this appeal. Thus, we cite to the current version. 

6. The trial court found the PMLA between TCM and KSP is valid, even though the PMLA was executed on February 22,
1995, before KSP's certificate of organization was issued by the Secretary of State's office on March 16, 1995. The trial
court's conclusion regarding the validity of the PMLA is not challenged on appeal, and we do not address it. 

7. The 1999 amended version of the statute provides, "[e]xcept as provided by this section and Section 466.410, the right of
any person to a prize is not assignable." Tex. Gov't Code Ann. § 466.406(a) (Vernon Supp. 2000) (emphasis supplied). 
Section 466.410, also added in 1999, provides generally that a person may assign the right to receive prize payments,
provided such assignment is by order of a district court, in accordance with strict requirements set forth in the statute. See
Tex. Gov't Code Ann. § 466.410 (Vernon Supp. 2000) (emphasis supplied). Unless otherwise noted, all references to
section 466.406 are to the 1993 version in effect when the trust was created. 

8. Effective September 1, 1997, article 5069-1.05 was codified in chapter 304 of the Texas Finance Code. See Act of May
24, 1997, 75th Leg., R.S., ch. 1008 § 1, 1997 Tex. Sess. Law Serv. 3435 (current version at Tex. Fin. Code Ann. § 304.003
(Vernon Supp. 2000)). No substantive change in law was intended by the codification. Tex. Fin. Code Ann. § 1.001(a);
Act of May 24, 1997, 75th Leg., R.S., ch. 1008 § 7 & Preamble, 1997 Tex. Sess. Law Serv. 3091, 3603. Here, we cite to
article 5069-1.05, the statute in effect when the lawsuit was filed on December 11, 1995. See O'Reilly v. Grafham, 797
S.W.2d 399, 401 (Tex. App.--Austin 1990, no writ) (in applying article 5069-1.05, actions are governed by law in effect at
time of filing);A.B.F. Freight Sys., Inc. v. Austrian Import Serv., Inc., 798 S.W.2d 606, 617 (Tex. App.--Dallas 1990, writ
denied) (same). 

9. Section 2 of article 5069-1.05 provides ". . . all judgments of the courts of this state earn interest at the rate published by
the consumer credit commissioner in the Texas Register." The statute specifies the method for how the interest rate shall
be calculated. The rate published for the applicable period is ten percent (10%). See 22 Tex. Reg. 9755 (September 26,
1997) (Office of Consumer Credit Commissioner).